### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEROY HOWARD, JR.** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **KILOLO KIJAKAZI,** | : | **No. 20-cv-04412-RAL** |
| **Commissioner of Social Security,**[1] | : | |
| | : | |
| **Defendant** | : | |

**Richard A. Lloret**                                                    **October 20, 2021**
**U.S. Magistrate Judge**

## <u>MEMORANDUM OPINION</u>

Leroy Howard seeks review of the denial of his claim for Supplemental Security Income (SSI) benefits. He claims he has been disabled from May 11, 2018. Because I find that the ALJ committed error in failing to assemble a complete record, and in the structuring of the hypothetical question presented to the Vocational Expert (VE) at the hearing, and that the opinion of the ALJ lacks information necessary to make a meaningful review, I will reverse the Commissioner's denial of benefits and remand this matter for further proceedings consistent with this opinion.

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ms. Kijakazi should be substituted for the former Commissioner of Social Security, Andrew Saul, as the defendant in this action.  No further action need be taken to continue this suit pursuant to section 205(g) of the Social Security Act.  42 U.S.C. § 405(g).
 (Social Security disability actions "survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office").

## I.     FACTUAL AND PROCEDURAL HISTORY

Leroy Howard, the plaintiff, suffered a back injury a number of years ago that progressively worsened until he ultimately required a disc fusion operation. R. 35. Plaintiff was represented by counsel at the hearing. Counsel advised the ALJ that the record was not complete, that counsel was still waiting on medical records. Counsel asked for thirty days to complete the record. R. 32. She made the same request in writing on October 9, 2019, a week before the hearing, stating that she was awaiting medical records (1) from Temple University for date ranges of 1/1/2019 through 9/1/2019; (2) Temple Neurosurgical Associates records for date ranges of 1/1/2018 through 9/1/2019; and (3) records of Dr. Abraham-Chen (sic) for date ranges of 1/1/2017 through 9/1/2019. R. 263. The court granted a 14-day extension and advised that counsel would need to ask for an additional extension if the records were not obtained within that two-week period. R. 33. Only a single document from Temple Hospital relating to the second back surgery is contained in the record, and there is no documentation of a request for extension from counsel. This single record, however, establishes that Mr. Howard did have back surgery—it consists of a two-page document from Temple Hospital indicating a follow-up appointment had been scheduled for two weeks "post op clinic visit – examine wound." R. 150. It states that a "revision of lumbar fusion hardware" was performed by Bong-Soo Kim, M.D. sometime between the dates of August 29, 2019 and September 2, 2019. *Id*. This single document was apparently appended to counsel's request to push the hearing date, (*see infra*, p. 3) and is contained in Exh. No. C14B, R. 149-50. There is additional support in the record for the fact that this was the Plaintiff's second back surgery, and that Mr. Howard had his original spinal fusion surgery earlier than August 2019. R. 36. Mr. Howard told the ALJ he was

2

prescribed a cane after "the first one. I had two of 'em." *Id.* He said the first surgery was in April 2018, and the second was "two or three months ago," which his counsel clarified was in August 2019. R. 37. There are no documents referencing the first surgery in the record.

Mr. Howard asserts disability beginning on May 11, 2018, when Plaintiff was 50 years of age. R. 36. Mr. Howard originally sought Disability Insurance (DIB) beginning on September 30, 2011, however, he withdrew that request at the hearing and proceeded on a claim for SSI, with an onset date of May 11, 2018. R. 34. Counsel stated that this date was when "his condition got severe," and when "more than just the conservative treatment begins." *Id.*

## A. The Hearing.

A hearing was held on October 17, 2019. Mr. Howard's attorney requested an adjournment of the October 17 hearing date on September 17, 2019, stating that "the claimant recently had back surgery and will be unable to attend the hearing," and that due to the recent surgery he had been unable to assist the attorney in preparing for the hearing, by providing a list of treating doctors, assisting with obtaining necessary medical proof and evidence, or "meaningfully communicat[ing] with our office at this time." R. 142. The request apparently was denied, as there is a reminder notice of the hearing dated October 3, 2019, R. 151, and the hearing proceeded on the originally scheduled date.

At the hearing, Mr. Howard's counsel described the progression of his back problems and the current state of his treatment, as well as the theory under which Mr. Howard would be entitled to benefits, as follows:

So around May 11, 2018, is when his back condition really has gotten worse. He has started getting treatment that was more than conservative, meaning he started getting injections at that point in time, his back was too bad to do physical therapy. And in April of 2019,[2] he actually had a spinal fusion on his back. He was prescribed a cane after the spinal fusion was done. He now ambulates with the cane. Prior to spinal fusion, his condition was actually pretty severe. He couldn't even stand up straight. After spinal fusion, he has noticed some improvement, but certainly not enough to return to work. At this point he will tell you that he can now stand straight, whereas before he couldn't; unfortunately, he still has pain in his back. It's not as severe as it used to be, but he still has it. He still is limited to bending; still has difficulty going up and down stairs; bending, doing basically these types of activities. But obviously spinal fusion did have some positives, and he will tell you about those. . .. And certainly since getting this spinal fusion in April, even with that surgery, he still hasn't noticed an improvement sufficient enough to do really more than sedentary level work. So, I believe he should grid out, and that's really the, the case theory.

R. 34-5.

Mr. Howard described to the ALJ that he had numbness in his hands and feet, that he could no longer lift anything heavier than 20 pounds, and that his wife and son now, "take care of everything." R. 36. He said that his second spinal fusion surgery required replacement of the rod, which had become bent, and replacement of the screws. R. 37. He testified that he uses a cane all the time as he was concerned that he would tear something after the second surgery. *Id.* He was not yet able to participate in any type of physical therapy as of the date of the hearing. R. 38. Despite the surgery, he still experienced tingling and numbness in his hands and feet when sitting, which the doctor had told him was to be expected, "'til you know, whenever your body catches back up." *Id.* Mr. Howard also wore a back brace to the hearing, and he told the ALJ this was also prescribed by the surgeon, that it was the third one he had been given to wear.

---

[2] Because of the complete lack of records for this first surgery, there is no way to know whether the first surgery occurred in April 2018, as related by the Plaintiff, or April 2019, as stated by the attorney.

R. 39. He found it allowed him to "sit up straight." *Id*. When asked how long he could

stand up, he told the ALJ he could stand for, "maybe 15 minutes," but would then need

to lie down, due to numbness in his legs. *Id*. During the hearing Mr. Howard mentioned

he could sit continuously for "about another 20 minutes," as he was beginning to "get

numb." R. 40.[3] Mr. Howard advised that he had only been walking "around the house,"

and that his attendance at the hearing was the farthest he had walked since his surgery.

He did not venture a guess as to how far he could actually walk on the date of the

hearing. *Id*. He stated that he could regularly lift ten to fifteen pounds. *Id*. Although he

maintained a driver's license, he did not drive and got a ride to the hearing from a family

member. *Id*.

Mr. Howard told the ALJ that he does not cook, clean, shop, or do laundry,

leaving all of that to his wife. R. 41. He has a refrigerator and microwave upstairs in his

bedroom so he can avoid taking the stairs, after he fell and "bust my mouth open," when

his leg gave out and he fell. *Id*.[4] He spends his days watching television and reading. R.

42.

In response to questions from his attorney, Mr. Howard also described having

arthritis in his hands, knees, and feet. *Id*. The knee produces the most pain, at night. *Id*.

He cannot reach overhead to take an item down from a shelf, and he experiences

difficulty bending down, even to toilet himself, sometimes resulting in his having to take

a shower because of being unable to bend to clean himself. R. 43.  At the end of the

attorney's questions, the ALJ noted that she did not see medical records in support of

his "hand limitations," or the arthritis diagnosis. Counsel advised that she was waiting

---

[3] While difficult to judge, Mr. Howard made this statement on the tenth page of the transcript, or
a little more than halfway through the thirty-minute hearing.

[4] This accident occurred prior to the first surgery. *Id*.

on the records to support his upper body issues (presumably the records from the Temple Hospital surgeon who performed the spinal fusion), and that she had just learned of the arthritis diagnosis and would also obtain those records. R. 44. The record was not supplemented with any records after the date of the hearing. In response to questioning from the ALJ with regard to whether "they [have] done any type of testing or nerve conduction studies or anything on your hands?" Mr. Howard responded, "[n]ah. Well—all I've, all I've—did the surgery, I seen 'em, n' then I seen 'em in three more months. So that should be like anotha (sic) month I see all the specialist again." R. 45.

## B.    The Medical Records.

The earliest medical record in the file appears to be the Operative Report of Dr. Emily Abramson-Chen describing a right L5 transforaminal epidural steroid injection she performed on August 17, 2017. R. 325. She performed a right L4 transforaminal epidural steroid injection eight months later, on April 19, 2018. R. 324.

Chronologically, the next record contained in Mr. Howard's file is an office note from William J. Markmann, M.D.[5] documenting an examination he performed on or about February 22, 2018. R. 280. He noted that Mr. Howard had left knee pain and back pain radiating down his right leg. The x-rays of Mr. Howard's left knee showed "medial joint space narrowing, just about bone-on-bone," and x-rays of his lumbosacral spine showed disc space narrowing, not bone-on-bone, at L4-L5 and L5-S1. Plaintiff had a positive straight leg raise on the right side. Dr. Markmann administered a steroid injection to his left knee and ordered an MRI scan of the lumbosacral spine. R. 280.

---

[5] The letterhead on Dr. Markmann's office notes establishes that Dr. Abramson-Chen and Dr. Markmann practice together, along with a number of other doctors, in an orthopedic surgery and rehabilitation practice.

On April 5, 2018, Dr. Markmann's notes indicate that Plaintiff's MRI scan showed he has "multilevel degenerative disease" with "marked disc space degeneration with disc desiccation at L-3-4, L4-5 and L5-S1. . .. He has significant central stenosis at L4-5 and less so at L3-4 and L5-S1." R. 287. Dr. Markmann recommended "he go ahead and try another epidural injection," as an injection he received "years ago" seemed to help. *Id.* The MRI report from Jeanes Hospital details the findings from the March 15, 2018 MRI, listing all of the issues mentioned by Dr. Markmann as well as stating there was evidence of "varying degrees of disc height loss" from L4 to S1. R. 308. Although the MRI report indicates it was compared with an earlier MRI of the lumbar spine taken on July 6, 2017, there is no indication how the two compared. The records of that earlier MRI, also done at Jeanes Hospital, listed the conclusion as:

> Bulging annuli at the L3-L4, L4-L5 and L5-S1 levels with broad central disc herniation noted at the L3-L4 level producing a combined congenital and central spinal stenoses between L3 and S1 and neural foraminal stenoses of the L3, L4 and L5 nerve roots bilaterally. A moderate degree of facet arthropathy and ligamentous hypertrophy is also identified at these same levels.

R. 321. The "final report" written concerning this same MRI study indicated that the results were "similar to the prior study," although there is no indication in the report of the date of the earlier MRI. R. 320.

On April 19, 2018, Plaintiff received an L4 transforaminal epidural steroid injection from Dr. Abramson-Chen. R. 323. (Operative Report).

An office note from May 3, 2018 by Dr. Stephen Sturtz references an epidural steroid injection by Dr. Abramson-Chen six weeks prior to May 3. R. 279. It is unclear whether this is simply a typographical error and refers to the steroid injection *two* weeks prior, or whether there was an additional steroid injection in mid-March 2018. Dr.

Abramson-Chen's records were one of the categories the attorney noted were missing from her file prior to the hearing. *See supra*, p. 2. The note documents that Mr. Howard was still experiencing numbness and spasm in "the leg," (not indicating left or right) however, he did not exhibit weakness and his straight leg raising was negative. *Id*. Finally, the record also includes an Operative Report for an epidural steroid injection on May 31, 2018, performed by Dr. Abramson-Chen. R. 278, 322.

### C.    Mr. Howard's Education, Job History, and Disability Report.

Mr. Howard has an eleventh-grade education and has only held jobs involving manual labor for his entire life. R. 204. His income record shows his last income, of just under $4,000, was in 2008. R. 174-75. He listed the types of jobs he held as a "helper" for a trash company from 1987 to 1991, "loading trucks" from 2004 to 2006, "labor" at a concrete company from 1997 to 1998, "labor" for a trucking company from October 2000 to September 2002, and a residential aide for an adult care company from March 2002 to June 2007. R. 204. Plaintiff's disability report, dated May 21, 2018, states that as of that date he used both a cane and a back brace, and he stated that he was unable to work because it was "hard for to walk and lift (sic)." R. 215-16. His supplemental function questionnaire described his pain as being located in his lower back down to his knees and legs, as well as stating that his feet are numb and he is unable to bend or stand without pain. R. 222.

### D.    The Medical Opinions.

Andrea Woll, D.O. conducted a consultative examination (CE) on the Plaintiff on August 22, 2018. She provided an "Internal Medicine Examination" on that date. R. 327-41. She completed a "check-the-box" form and a four-page narrative of her

examination. R. 332-37.[6] Dr. Woll was given "some paperwork" from Dr. Markman, dated "02/02/18." R. 329. She also received an evaluation of his vision from the Philadelphia Vision Center and "a paper from 05/31/18" describing an injection for right lumbar radiculopathy with spinal stenosis, and the office note dated 05/03/18. R. 329. She described Mr. Howard's explanation of his back pain, which he told her began after he fell through a roof while working construction in 2007. R. 327. He advised her that his last steroid injection was unsuccessful in reducing his pain level, and he was going to "probably" have surgery done on his back. *Id.* Dr. Woll also described Mr. Howard's knee pain and mentioned that he had x-rays done of his knees that showed some degenerative arthritis. (She did not state whether she saw those x-rays.) *Id.* Dr. Woll noted that Mr. Howard did not use a cane or other assistive device on the day of the examination, but she did note an antalgic gait. R. 328.

Dr. Woll's form stated that Plaintiff could lift 20 pounds continuously, up to 50 pounds occasionally or frequently,[7] and never more than 50 pounds. R. 332. She opined that in an eight-hour workday, he could sit up to six hours, but could stand or walk for only four hours. R. 333. Dr. Woll opined Mr. Howard could stand or walk for three hours without interruption. *Id.* Dr. Woll opined that Mr. Howard could only

---

[6] Case law in this jurisdiction affords limited weight to "check-the-box" medical assessments. "Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993). The reliability of such reports is suspect when they are unaccompanied by thorough written reports of a doctor. *See id.* (citing *Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cir. 1986)). Furthermore, an ALJ must consider the nature and extent of a doctor's treating relationship and the consistency of a doctor's assessments with other evidence on the record. *See Jennings v. Astrue*, No. 09-1642, 2009 WL 7387721, at *12 (E.D. Pa. Nov. 30, 2009) (citing 20 C.F.R. § 404.1527(d)(3)-(4))). Here, the check-the-box form, done well in advance of Mr. Howard's surgeries, nevertheless contained the exact same limitation as that of Dr. Bart—no more than four hours per workday of standing or walking.

[7] Curiously, both boxes (occasionally and frequently) were checked, in both the "lift" and "carry" grids.

occasionally climb ladders or scaffolds, but otherwise found no limitations in postural activities, and she found no limitations in the use of either hand. R. 334-35. She did not indicate that he had any limitations in performing activities of daily living due to physical impairments. R. 337. Dr. Woll's report also contained a range of motion chart, which was marked "WNL," (within normal limits) on each page. R. 338-41.

A physical residual functional capacity assessment was conducted by John Bart, D.O., as part of the Disability Determination by the state agency. R. 57-78. Dr. Bart reviewed Dr. Woll's CE, as well as Mr. Howard's Function Report, records from Philadelphia Vision Center, for Orthopedic Surgery and Rehabilitation Association (Drs. Markmann and Abramson-Chen), Jeanes Hospital, and Dr. Stephen Sturtz, Mr. Howard's primary physician. R. 58-59. Dr. Bart assigned primary priority to Mr. Howard's osteoarthrosis and allied disorders, and secondary priority to his disorders of the back-discogenic and degenerative. R. 62. He also listed major joint dysfunction as an "other" priority. *Id*.

Dr. Bart's Physical Residual Functional Capacity Assessment found that Mr. Howard does have exertional and postural limitations as a result of his conditions, and gave the following ratings:

- Occasionally lift and/or carry 20 pounds.
- Frequently lift and/or carry 10 pounds.
- Stand or walk for a total of four hours.
- Sit for a total of six hours.

R. 74. Dr. Bart's assessment limits Mr. Howard to occasionally climbing stairs, balancing, stooping, kneeling, crouching and crawling. R. 74-75. He stated that his conclusions were based on "right lumbar radiculopathy with spinal stenosis on MRI;

10

slightly antalgic gait with BMI of 33.9;[8] no muscle atrophy, reflexes and sensation intact; motor 5/5 in all four extremities." R. 74. Thus, although stating that Dr. Woll's CE overestimated Mr. Howard's functional limitations "given his lumbar radiculopathy and slightly antalgic gait on exam," Dr. Bart's review of Mr. Howard's MRI and steroid injections led him to limit Mr. Howard to just four hours per day either standing or walking in an eight-hour workday, matching Dr. Woll's limitation. Additionally, given the limitations he found, Dr. Bart stated in the "application of medical-vocational rules" that Mr. Howard was limited to "sedentary" work, and listed "table worker, addresser, and food and beverage order clerk" as potential job categories. R. 77. Dr. Bart's ultimate conclusion, however, was that Mr. Howard was "not disabled" as of the date of his report. R. 78. The report was dated September 12, 2018.  Given the date of the report, Dr. Bart should have been aware of the first spinal fusion surgery, if it occurred in April 2018, but not if it happened in April 2019. It thus appears more likely that both surgeries occurred in 2019 and Dr. Bart was not privy to the fact that Mr. Howard underwent two spinal fusion operations.

 Mr. Howard's application for Supplemental Security Income (SSI) was denied at the initial level on October 2, 2018, R. 54-78, and he requested a hearing, which was held on October 17, 2019. R. 27-53.

     **E.**    **The ALJ's decision.**

The ALJ issued an unfavorable decision on November 26, 2019. R. 15-23. The ALJ found that Mr. Howard could perform work at the "Light" exertional level, with certain limitations, and that sufficient jobs fitting this description existed in the

---

[8] Mr. Howard's BMI appears to have fluctuated over the years, and the ALJ found that obesity was not a severe impairment. R. 18. She did state that she took obesity into account in conjunction with his other severe impairments, as required by Social Security Regulations. *Id*.

economy to find that Mr. Howard is not disabled. R. 22-23 (Finding No. 10.), 50

(testimony of VE). The Appeals Council denied Mr. Howard's request for review on

August 4, 2020 without further explanation. R. 1-6. This timely appeal followed.

## II.    STANDARDS OF REVIEW

Mr. Howard has the burden of showing that the ALJ's decision was not based on

"substantial evidence." 42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552

(3d Cir. 2005). "Substantial evidence" is not a high standard. *Biestek v. Berryhill*, 139 S.

Ct. 1148, 1154 (2019).  "It means—and means only—such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Id.* (citations and

internal quotations omitted).

> The RFC [Residual Functional Capacity] assessment is a function-by-function
> assessment based upon all of the relevant evidence of an individual's ability to do
> work-related activities. At step 4 of the sequential evaluation process, the RFC
> must not be expressed initially in terms of the exertional categories of
> "sedentary," light," "medium," "heavy," and "very heavy" work because the first
> consideration at this step is whether the individual can do past relevant work as
> he or she actually performed it.

SSR 96-8P, *3 (1996). Policy Interpretation Ruling Titles II and XVI: Assessing Residual

Functional Capacity in Initial Claims.

"A reviewing court reviews an agency's reasoning to determine whether it is

'arbitrary' or 'capricious,' or, if bound up with a record-based factual conclusion, to

determine whether it is supported by 'substantial evidence.'" *Dickinson v. Zurko*, 527

U.S. 150, 164 (1999), quoting *SEC v. Chenery Corp*., 318 U.S. 80, 89-93 (1943).

I exercise "plenary review over questions of law." *Newell v. Commissioner of*

*Social Security*, 347 F.3d 541, 545 (3d Cir. 2003) (citation omitted). I must determine

whether the ALJ applied the proper legal standards in reaching the decision. *See Coria*

*v. Heckler*, 750 F.2d 245, 247 (3d Cir. 1984). Accordingly, I can overturn an ALJ's decision based on a harmful legal error even when I find that the decision is supported by substantial evidence. *Payton v. Barnhart*, 416 F. Supp. 2d 385, 387 (E.D. Pa. 2006) (citing *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983).

An ALJ must provide sufficient detail in her opinion to permit meaningful judicial review. *Burnett v. Commissioner of Social Security Admin.*, 220 F.3d 112, 120 (3d Cir. 2000). When dealing with conflicting medical evidence, the ALJ must describe the evidence and explain her resolution of the conflict. As the Court of Appeals observed in *Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999):

> When a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir. 1993). The ALJ must consider all the evidence and give some reason for discounting the evidence [she] rejects. *See Stewart v. Secretary of H.E.W.,* 714 F.2d 287, 290 (3d Cir.1983).

While it is error for an ALJ to fail "to consider and explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination . . .", *Burnett*, 220 F.3d at 121, an ALJ's decision is to be "read as a whole" when applying *Burnett*. *See Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004); *Caruso v. Commr. of Soc. Sec.*, 99 Fed. Appx. 376, 379–80 (3d Cir. 2004) (unpublished) (examination of the opinion as a whole permitted "the meaningful review required by *Burnett*," and a finding that the "ALJ's conclusions [were] . . . supported by substantial evidence.") The issue is whether, by reading the ALJ's opinion as a whole against the record, the reviewing court can understand why the ALJ came to her decision and identify substantial evidence in the record supporting the decision. *Id.* at 379.

### III.   DISCUSSION

Plaintiff argues that the ALJ committed error when she found Dr. Bart's expert opinion "persuasive" but failed to include his limitations of four hours of standing or walking per eight-hour workday in her RFC, or in the alternative, explaining its exclusion. Plaintiff's Brief, Doc. No. 12 ("Pl. Br.") at 5. The error was harmful, he alleges, because such a limitation would preclude "light" work under the Social Security Regulations, which by definition requires a claimant to be able to stand or walk for a total of six hours in an eight-hour workday. *Id*. at 6.  Plaintiff argues that, if the ALJ intended to reject Dr. Bart's opinion, she was required to explain her reasons for doing so under 20 C.F.R. §416.920c. *Id*. at 5. Because she did not, he argues, after having found the opinion "persuasive" and characterizing it as "well-supported" and "consistent with the . . . record as a whole," remand is required. *Id*. at 7.

The Commissioner counters that, given the deferential standard of review required when examining the ALJ's decision, there was no error, as the ALJ adequately explained the basis of her RFC, and properly applied the new framework for evaluating medical opinions and prior administrative findings. Commissioner's Response, Doc. No. 13 ("Comm. Resp.") at 5. The Commissioner further takes issue with Plaintiff's argument that "light" work requires that the Plaintiff be able to stand and/or walk more than four hours per day, as some jobs classified as "light" may be performed "sitting most of the time." Comm. Resp. at 1, citing 20 C.F.R. § 416.967(b). The Commissioner argues that the ALJ properly considered "the most important factors" of supportability and consistency in Dr. Bart's report, as required by 20 C.F.R. §416.920c(b)(2). *Id*. at 7. "As she [the ALJ] explained, she found Dr. Bart's September 2018 finding persuasive, as it was supported by and consistent with the objective findings and treatment history '*to*

14

*that point.*'" (emphasis in original). *Id.* at 10. Because there were no "further medical records" (that is, from August 2018 through the November 21, 2019 decision date), the Commissioner argued, "the ALJ reasonably explained that the subsequent lack of treatment and evidence from August 2018 through the November 2019 decision – more than one year – did not support greater limitations than provided in the RFC." *Id.* at 10 (citing to R. 21).

In his reply, Plaintiff argues that the Commissioner's "lengthy treatise" on the Agency's new rules for assessing medical opinions is designed to distract from the main issue, that the ALJ failed to clarify "her ultimately contradictory findings in accordance with legal requirements," and therefore the decision is not legally supportable and should be remanded. Plaintiff's Reply Brief, Doc. No. 14 ("Pl. Rep.") at 1-3.

I agree with Plaintiff that the case should be remanded. Having reviewed the file, however, I believe that the problems with the ALJ's decision are even more fundamental, and more troubling, than the specific issue raised by the Plaintiff.

### A.      The ALJ failed to complete the record.

 "When a case is assigned to an ALJ for a hearing and decision, the ALJ is responsible for all actions necessary to process the case. An ALJ's principal responsibilities are to hold full and fair hearings and to issue legally sufficient and defensible decisions." HALLEX I-2-0-5. (Hearing Office Chief Administrative Law Judge, Administrative Law Judge, and Hearing Office Staff Responsibilities). Here, the ALJ was faced with a claimant who was wearing a back brace, used a cane, and has severe degenerative disc disease, in both his spine and his knee, all documented either with the ALJ's own eyes (in the case of the brace and cane), and multiple Magnetic Resonance Imaging (MRI) procedures that verified the serious nature of Mr. Howard's

back problems. The medical records additionally included records of multiple steroid injections in an effort to alleviate Mr. Howard's pain.

Added to this evidence is the unrefuted assertion that Mr. Howard underwent not one, but two spinal fusion surgeries. Although nothing in the record contradicts the fact that these surgeries occurred, and the attorney, both in writing and orally advised the judge that there were problems obtaining the records, the ALJ still made the decision not only to issue an opinion deciding the case without them, but included in that opinion the statement that, "[b]ased on the available record, the claimant's treatment has been conservative in nature and no treating physician has indicated that the claimant is disabled . . .". R. 21. Mr. Howard's treatment involved two radical surgeries in which his spinal column was fused. There is no dispute that these surgeries occurred. Neither is there any dispute that the records of these surgeries, and any post-operative treatment, were missing from the administrative record. Finally, neither Mr. Howard's treating physicians nor any consulting physicians were asked to evaluate and supply an opinion about his functional limitations post-surgery. The ALJ ignored the absence of this critical evidence and issued a decision as if the two back surgeries had never happened. This was legal error.

Because a Social Security disability proceeding is non-adversarial in nature, the ALJ bears the ultimate responsibility of developing the record. *See Sims v. Apfel,* 530 U.S. 103, 111 (2000) (duty to investigate the facts and develop the arguments); *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995) (same). The Social Security Regulations make it clear that the proceedings are non-adversarial, and the ALJ has the affirmative obligation to develop the administrative record. *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("The Secretary's regulations describe this duty by stating that, '[b]efore we make

a determination that you are not disabled, we will develop your complete medical history … [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.' 20 C.F.R. § 404.1512(d).").

The responsibility to develop the record adequately exists whether the plaintiff is represented or not. *Plummer v. Apfel*, 186 F.3d 422, 434 (3d Cir. 1999) (represented plaintiff); *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (represented plaintiff). The duty to fully develop the record does not disappear merely because a claimant is represented by counsel. *See Baker v. Bowen*, 886 F.2d 289, 292 n.1 (10th Cir. 1989) ("[T]he ALJ … has the affirmative duty to fully and fairly develop the record regardless of whether the applicant is represented by an attorney or a paralegal."); *Craig v. Commissioner of Social Security*, 218 F.Supp.3d 249, 262-63 (S.D.N.Y. 2016) ("The ALJ must develop the record even where the claimant has legal counsel."). Where the failure to adequately develop the record prejudices the plaintiff, it is error. *Reefer v. Barnhart,* 326 F.3d 376, 380–81 (3d Cir. 2003) (Plaintiff was prejudiced by the failure of the ALJ to obtain medical records, including a head CT, documenting brain stem surgery and a stroke).

The adequacy of the ALJ's development of the record varies case-by-case and depends upon the circumstances of the case. *Id*. at 380 (citing *Lashley v. Sec'y of Health & Human Servs.,* 708 F.2d 1048, 1052 (6th Cir. 1983) (courts determine the adequacy of an ALJ's investigation on a case-by-case basis)). Certainly, one of the circumstances that bears on the analysis of adequacy is whether the plaintiff was represented or was proceeding *pro se*. *See Rosa v. Colvin*, 956 F.Supp.2d 617, 623–24 (E.D. Pa. 2013). Other circumstances bear on the analysis, as well: the likelihood that records of the condition exist, the ALJ's awareness of the existence of records, the seriousness of the

medical condition, and whether existing evidence in the record adequately details the condition. *See Smith v. Commissioner of Social Sec.*, 80 Fed. App'x. 268, 269–70, 2003 WL 22594404, at *1 (3d Cir. 2003) (not precedential) (an ALJ need not inquire into "minute" details of treatment). As the Seventh Circuit has stated, "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009), citing *Binion v. Shalala,* 13 F.3d 243, 246 (7th Cir. 1994). But where there were specific, relevant facts that the ALJ obviously failed to consider, especially where that information would have likely led to an award of benefits, there is error. *Id*.[9]

Here the missing records were not about minutiae, and their existence was not speculative. There is unrefuted evidence that plaintiff underwent two back surgeries, undocumented in the record before the ALJ, but documented by missing medical records about which the ALJ was aware. The two surgeries had obvious relevance to the disability claim. The potential prejudice to Mr. Howard was patent: the back surgeries occurred after the medical evaluations on which the ALJ relied to make her determination, so the existing record simply did not take account of the surgeries. Under these circumstances it was error for the ALJ to ignore the missing records and rule on the record before her as if the two back surgeries had never happened. *See Reefer*, 326 F.3d at 380 (error to ignore unrefuted evidence of brain stem surgery and a stroke); *Plummer* 186 F.3d at 434 (error to ignore evidence of mental impairment). The

---

[9] In *Nelms*, the court stated:

> But here the ALJ was aware that Nelms was still receiving treatment in 2005 and that his back pain was severe and continuing. His leg pain persisted as well. Yet the ALJ did not probe, in any depth, Nelms's recent past at the hearing or gather *any* medical evidence to fill the two-year gap in the record. Had the ALJ done so, he would have uncovered documentation of orthopedic decline.

*Id*. at 1099 (emphasis in original).

ALJ could have waited for the plaintiff's counsel to supply the records or subpoenaed

them herself, 20 C.F.R. § 404.1512; *Rosa v. Colvin*, 956 F.Supp.2d 617, 623–24 (E.D. Pa.

2013), but ignoring the records was not an option. Here, counsel advised the ALJ in

writing both that she needed an additional month to obtain records, and that the

hearing date should be moved *because the claimant just had back surgery* and was

unable to assist in preparation for the hearing, including providing a list of treating

doctors. R. 142.

The Commissioner argues that there was no error by the ALJ because "she found

Dr. Bart's September 2018 finding persuasive, as it was supported by and consistent

with the objective findings and treatment history '*to that point*'" (emphasis added by the

Commissioner). Comm. Resp. at 10. But because "there were no further medical records

between August 2018 and the ALJ's November 21, 2019 decision," she argues, the ALJ

made no error. The Commissioner even quotes this portion of the decision:

> [T]he record remained open at [Plaintiff's] request for the receipt of additional
> medical evidence. However, no additional records were provided. Therefore, the
> available record ends in August 2018 and does not contain evidence of the
> claimant's . . .  ongoing complaints, or positive diagnostic clinical findings to
> support the claimant's testimony related to the level of his ongoing pain and
> dysfunction. Overall, *the record lacks supporting medical evidence* to show an
> ongoing disability that would prevent the claimant from working at the limited
> light level of activity noted in the established [RFC]. (Tr. 21) (emphasis added by
> the Commissioner).

Comm. Resp. at 10.

The record did contain supporting medical evidence, in the form of the single

document counsel was able to obtain, concerning Mr. Howard's second back surgery,

which definitively established that Mr. Howard spoke the truth about his surgeries. R.

150. Combined with several years of records from the Orthopedic practice of Drs.

Markmann and Abramson-Chen, which established through MRI reports and steroid injections that Mr. Howard suffers from severe degenerative disc disease, the ALJ abused her discretion in failing to take any steps to complete the gap in the records. Not only was the ALJ's evaluation of the record undone by the legal error in not obtaining records of the plaintiff's back surgeries, given what the ALJ knew after the hearing, the decision was "arbitrary" and "capricious." The case should be remanded with direction to the Commissioner to obtain the missing medical records and re-evaluate the case in light of the plaintiff's two back surgeries. *See Dickinson v. Zurko*, 527 U.S. 150, 164 (1999); *SEC v. Chenery Corp.*, 318 U.S. 80, 89-93 (1943).

### B.   The hypothetical question was fatally flawed and therefore of no evidentiary value.

The ALJ proposed a fatally flawed hypothetical to the Vocational Expert, leading to the ultimate issue raised by the Plaintiff in his briefing—that the ALJ did not properly account for the fact that Dr. Bart (and also Dr. Woll) limited Mr. Howard's standing and walking to just four hours in an eight-hour workday. Instead, the ALJ proposed the following hypothetical to the VE:

> If you could please consider someone of our claimant's age, education, and work experience *who's able to perform work at the light exertional level*; except only frequently climb ramps or stairs; never climb ladders, ropes, or scaffolds, and only occasionally stoop, crouch, kneel, and crawl; could have only occasional exposure to driving vehicles, unprotected heights, and moving machinery, and would need to avoid concentrated exposure to extreme heat or cold, wetness or humidity, and irritants such as fumes, odors, dusts, and gasses, poorly ventilated areas, and exposure to chemicals. Would there be work for such an individual in the national economy . . .?

R. 50 (emphasis added).

The Third Circuit has long held that a hypothetical question to a vocational expert that fails to take into consideration all of a claimant's physical impairments will not

result in evidence that may be used to determine the ultimate question of disability. *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984) ("While the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." (citation omitted)). "A hypothetical question posed to a vocational expert 'must reflect *all* of a claimant's impairments.'" *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002), quoting *Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3d Cir.1987) (emphasis in original).

Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence. *Podedworny,* 745 F.2d at 218 (citing *Wallace v. Secretary of Health & Human Servs.,* 722 F.2d 1150, 1155 (3d Cir.1983)). Here, the two experts, both Dr. Woll and Dr. Bart, agreed—Mr. Howard cannot stand or walk for more than four hours in an eight-hour workday. R. 74, 333. Yet the hypothetical question posed to the VE asked if the individual could "perform work at the light exertional level" with other limitations not relating to standing or walking. The Social Security Regulations unequivocally state that "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251 at 4. 20 C.F.R. §416.967(b) states the definition of "light work," in pertinent part, as follows:

> A job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. *To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.*

20 C.F.R. §416.967(b), Physical exertion requirements (emphasis added).

I am unpersuaded by the Commissioner's argument that "a four hour stand/walk limitation would not preclude light work, and thus, such a limitation is not dispositive. . .. Notably, governing regulations acknowledge that a job can also be light 'if it involves sitting most of the time with some pushing and pulling of arm or leg controls.' 20 C.F.R. 416.967(b)." The ALJ did not limit the hypothetical she gave to the VE in this way. She merely asked for jobs that could be performed by a hypothetical claimant "at the light exertional level." [10]

> Hypothetical questions posed to vocational experts ordinarily must include *all* limitations supported by medical evidence in the record. *Cass v. Shalala,* 8 F.3d 552, 555–56 (7th Cir.1993); *Gilbert v. Apfel,* 175 F.3d 602, 604 (8th Cir.1999); *Winfrey v. Chater,* 92 F.3d 1017, 1024 n. 5 (10th Cir.1996). The reason for the rule is to ensure that the vocational expert does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations.

*Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). The ALJ pointed to no evidence in the record, other than the opinions of Dr. Bart and Dr. Woll, to account for Mr. Howard's ability to stand and walk. The two doctors' limitations are amply supported by the MRI's, the evidence of spinal steroid injections, and the two spinal surgeries.  There is no evidence in the record that the VE was given the expert reports of Drs. Bart and Woll, which may have allowed me to assume that the VE was aware of the four-hour

---

[10] The ALJ's RFC is consistent with the hypothetical to the VE:
> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except frequent climbing of ramps or stairs; no climbing of ladders, ropes, or scaffolds; occasional stooping, crouching, kneeling, and crawling; occasional exposure to extreme heat or cold, wetness or humidity, irritants such as fumes, odors, dusts, and gasses, poorly ventilated area, or chemicals.

R. 19.

stand/walk limitation. *See Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004). Given the teachings of *Podedworny* and *Chrupcala*, the VE's testimony is not supported by substantial evidence. Therefore, the ALJ's conclusion that there was substantial work that Mr. Howard could do, based upon that testimony, is unsupported.

The Commissioner argues that "in order to demonstrate error under the substantial evidence standard, Plaintiff needs to show not only that a reasonable adjudicator could find otherwise, but that a 'reasonable adjudicator would be compelled to conclude to the contrary.' *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020)." Because the error in this case means that the VE's opinion is not part of the "substantial evidence" calculus, *see Podedworny,* 745 F.2d at 218, a reasonable adjudicator "would be compelled to conclude" that the Commissioner failed to meet her burden of proof. *See Nasrallah*, 140 S. Ct. at 1692. This is so because the Commissioner, at step five of the required evaluation process, bears the burden of demonstrating that there are jobs in the national economy that Mr. Howard can perform. *Ramirez v. Barnhart*, 372 F.3d 546, 551 (3d Cir. 2004); *Connors v. Kijakazi*, 2021 WL 4523494, at *3 (E.D. Pa. 2021).

Put another way, the ordinary substantial evidence standard in *Nasrallah* operates when the ALJ makes factual determinations under the correct legal standard. But where the ALJ has determined the facts under an erroneous legal standard – in this case by omitting a material functional limitation from the RFC and the hypothetical to the VE – *Nasrallah's* "reasonable adjudicator" cannot but "conclude to the contrary." 140 S. Ct. at 1692. Thus it is that I can overturn an ALJ's decision based on a harmful legal error even if I conclude that the decision is, other than the factual determination infected by legal error, supported by substantial evidence. *See Payton v. Barnhart*, 416

23

F. Supp. 2d 385, 387 (E.D. Pa. 2006) (citing *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983)).

### C.      The ALJ's RFC decision cannot be meaningfully reviewed.

The discussion of the RFC in the ALJ's decision is devoid of detail that would allow me to meaningfully review the ALJ's deliberative process in determining Mr. Howard's RFC. While the ALJ spent considerable time and effort detailing the medical records that were in the record, *see* R. 20-21, once the ALJ moved on to stating how the RFC was actually determined, there is little to examine. After describing Dr. Woll's consultative examination, (which the ALJ found "partially persuasive,") there is a brief discussion of Dr. Bart's report:

> In September 2018, State agency medical consultant John Bart, D.O. determined the claimant is capable of a limited range of light work with four hours standing and/or walking in an eight-hour workday. The doctor further noted that the claimant could occasionally perform postural activities except for no climbing of ladders, ropes, or scaffolds (Exhibit C4A). This opinion is persuasive, as it is well supported by the objective diagnostic and clinical findings of record and consistent with the available record as a whole, including the claimant's treatment history to that point.

R. 22.[11] The problem arises in the ALJ's next and final passage of her step four discussion, where the opinion states:

> Based on the foregoing, the undersigned finds the claimant *has the above residual functional capacity assessment*, which is supported by the claimant's treatment history, the objective clinical findings, the claimant's subjective complaints, and all of the medical opinions and evidence of record.

*Id*. (Emphasis added).  The opinion appears to adopt Dr. Bart's findings, laid out in detail, as the basis of the RFC. The difference in the two is that the RFC determination

---

[11] This passage, of course, is the one that counsel for both Mr. Howard and the Commissioner quote as support for their respective arguments. *See* Comm. Resp. at 10; Pl. Rep. at 3.

says Mr. Howard "has the residual functional capacity to perform light work" (R. 19), while the discussion of Dr. Bart's report says Mr. Howard "is capable of a limited range of light work with four hours standing and/or walking in an eight-hour workday." R. 22. The ALJ found Dr. Bart's report "persuasive," indicating she accepted his assessment of Mr. Howard's physical limitations. *Id.* The ALJ's failure to explain the significant difference in these two statements, especially when combined with the ALJ's failure to develop the record and consider the effect of Mr. Howard's two back surgeries on his residual functional capacity, was error. *See Burnett v. Commissioner of Social Security Admin.*, 220 F.3d 112, 121-22:

> In making a residual functional capacity determination, the ALJ must consider all evidence before him. *See Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999); *Doak v. Heckler,* 790 F.2d 26, 29 (3d Cir.1986). Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence. *See Plummer,* 186 F.3d at 429; *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir. 1981). "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter,* 642 F.2d at 705.

As the Plaintiff argues, the "significant probative evidence" that was either not credited, or simply ignored here, is the standing/walking limitation of four hours. There may be some reason that the ALJ elected to ignore the standing/walking limitations contained in both Dr. Bart's and Dr. Woll's opinions, but that reason is unexplained. Nor has a reason become obvious upon my independent review of the record. Because the reason for the discrepancy between the limitations found by the two doctors and the limitations imposed in the RFC is unexplained, it evades meaningful review. This is error. For this reason, the ALJ's decision must be vacated and remanded.

## IV.    CONCLUSION

Because the ALJ failed to properly complete the record in the face of significant evidence of radical treatment for Mr. Howard's severe back impairment, because the hypothetical question posed to the VE at the hearing was fatally flawed, making the testimony of the VE unusable as evidence, and because the decision contains insufficient explanation with regard to the ALJ's consideration of the evidence of Mr. Howard's functional limitations in formulating the RFC, I will vacate the Commissioner's decision and remand this matter for further proceedings consistent with this Memorandum Opinion. Specifically, I instruct the ALJ to complete the record by obtaining copies of the records relating to both of Mr. Howard's back surgeries, and to conduct a new hearing, wherein the ALJ presents a proper hypothetical question to the Vocational Expert, in which the ALJ appropriately states Mr. Howard's physical limitations.


**BY THE COURT:**


   **_s/ Richard A. Lloret_**
**HON. RICHARD A. LLORET**
**United States Magistrate Judge**